IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

CEME-TUBE LLC,
      Plaintiff and Counter-Defendant,

   v.

CHROMA COLOR CORPORATION,
      Defendant & Cross-Claimant, and

THE CHARTER OAK FIRE INSURANCE COMPANY and
STATE AUTOMOBILE MUTUAL INSURANCE COMPANY,
      Defendants, Counter-Plaintiff & Cross-Claimants, and

SELECTIVE INSURANCE COMPANY OF SOUTH CAROLINA,
      Defendant & Cross-Claimant.

OPINION AND ORDER

22-cv-703-wmc

---

In this dispute, defendant Chroma Color Corporation moves for summary judgment on claims against it for (1) breach of implied warranty of merchantability, (2) breach of implied warranty of fitness for a particular purpose, (3) breach of express warranty, and (4) negligence. Because the parties agree their relationship is governed by contract law, and because the court agrees that the terms and conditions listed on Chroma Color's price quotations apply, the warranty claims here are all time barred. Further, Ceme-Tube's negligence claims are barred by Wisconsin's economic loss doctrine and Ceme-Tube is not pursuing an independent claim for breach of contract. Accordingly, the court will grant Chroma Color's motion, and the only remaining claims in this case are between the cross-claimants. Finally, the court will deny Chroma Color's motion for sanctions.

UNDISPUTED FACTS[1]

## A.  Background

Ceme-Tube is a limited liability company solely owned and operated by James Bradac.  In a declaration, Bradac avers that he lives in Wisconsin (Bradac Decl. (dkt. #165) ¶ 2), but testified at his deposition that he lives in Minnesota.  (Bradac Dep. (dkt. #138-1) 14.)  Chroma Color is a North Carolina corporation that makes colorant with its principal place of business in Illinois.[2]

Ceme-Tube makes "blow molded" tubes of high-density polyethylene ("HDPE") that are filled with cement and installed in a variety of settings, including as bases of light

---

[1] Unless otherwise noted, when viewing the evidence in a light most favorable to non-movant Ceme-Tube, including drawing all reasonable inferences in its favor, the following facts are undisputed.  More specifically, Ceme-Tube did not respond to many of Chroma Color's proposed findings of fact, so the court treats those facts as undisputed.  (Preliminary Pretrial Packet (dkt. #14) 5 ("Unless the responding party puts into dispute a fact proposed by the moving party, the court will conclude that the fact is undisputed.").)  Moreover, Ceme-Tube's proposed findings of fact did not follow this court's rules, as it did not limit each paragraph to a single factual proposition (*id.*), and it filed them late -- one day after the April 29 deadline.  (Dkt. #132.)  Nevertheless, the court has looked to the evidence underlying Ceme-Tube's proposed findings of fact and incorporated them as appropriate.  Finally, to the extent that evidence is directly relevant to the parties' arguments on summary judgment and otherwise admissible, the court has also considered evidence attached to Chroma Color's motion for sanctions.  S*ee Stinnett v. Iron Works Gym/Exec. Health Spa, Inc.*, 301 F.3d 610, 613 (7th Cir. 2002) ("In granting summary judgment, the court may consider any evidence that would be admissible at trial.").

[2] Diversity between the principal parties is satisfied whether Bradac's actual domicile is Wisconsin or Minnesota, and the insurance companies' places of incorporation and principal places of business do not defeat that diversity under 18 U.S.C. § 1332(c)(1).  However, Chroma Color asserts that this court lacks subject matter jurisdiction because Ceme-Tube has provided no evidence that the amount in controversy is over $75,000.  However, plaintiff plausibly pled damages of more than $75,000, having alleged that Chroma Color's defective colorant was used in the manufacture of about 18,000 of its tubes used in light poles and traffic bollards, although the lack of any lawsuits brought against Ceme-Tube by its customers for adequacy of the coloring on its tubes to date makes this a closer question.  *See* discussion *supra*.  (Second Am. Compl. (dkt. #117) ¶¶ 13, 17-19); *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 511 (7th Cir. 2006) ("a good-faith estimate of the stakes is acceptable if it is plausible and supported by a preponderance of the evidence").

poles and traffic bollards.  The covers were normally bright yellow to make them more visible to drivers.  (Bradac Decl. (dkt. #165) ¶ 6.)

Ultraviolet ("UV") light can damage HDPE, and even the best UV protectant does not entirely prevent HDPE degradation, only slows that process.  According to Chroma Color employee Michael Murphy and Ceme-Tube's experts, Robert Pieper and Nathan Olson, UV protection depends on the product thickness, geographic location, efficacy of color pigments as UV absorbers, the manufacturing process, and additives like hindered amine light stabilizers ("HALS").  (Murphy Dep. (dkt. #138-7) 4; Pieper Decl. (dkt. #173) ¶ 4; Olson Decl. (dkt. #172) ¶¶ 9-10.)

### B.  Ceme-Tube's and Chroma Color's Business Relationship

In 2007, Bradac first met with Stu Swain, a business development specialist with Chroma Color, to discuss Ceme-Tube's possible use of its yellow colorant.  In 2008, Bradac specifically told Swain that UV protection was very important to Ceme-Tube's products. Based on this discussion, Bradac understood that Ceme-Tube would be getting the best UV-protection package Chroma Color offered, although during this initial discussion, Bradac and Swain did not talk about how long this protection might extend product life in terms of "years."[3]  (Bradac Dep. (dkt. #138-1) 59-60.)

In September 2013, Bradac and Swain met again over dinner, during which Bradac avers that Swain said Ceme-Tube was getting the "best Cadillac package," which was

---

[3] Ceme-Tube purports to dispute this fact, citing to Swain's representations at a 2013 dinner, but Swain's later representations are not proof from which a reasonable jury could find that Bradac and Swain talked in *2008* about the length of time the highest level of UV protection would increase the life of the product.

3

supposed to protect against UV degradation for ten years with slow degradation after that.[4] (Bradac Decl. (dkt. #165) ¶ 32; Chroma Color Ex. L (dkt. #138-12) 2.)   In contrast, Chroma Color asserts that Bradac did not indicate what he expected, aside from asking for the best formula.   In particular, Swain disputes that he promised Bradac ten years' of UV protection, while acknowledging that he hyped Chroma Color's best UV protection package as the "Cadillac" or "best" package.   (Swain Dep. (dkt. #109) 6-7.)   For purposes of summary judgment, there is no dispute Bradac chose the "Cadillac" package by the fall of 2013.   (*Id.* at 7.)   At the same time, because he trusted Swain, Bradac concedes that he never specifically asked for a *guarantee* that bollards and light pole base covers using Chroma Color colorant would have a useful life for a specific number of years.   (Bradac Decl. (dkt. #165) ¶ 34.)

Between 2008 and 2018, and occasionally in 2020, Ceme-Tube outsourced tube manufacturing to the following "blow molders":  (1) ACM Plastic Products, Inc. ("ACM"); (2) Agri-Industrial Plastics; (3) Blow Molded Specialties, Inc. ("BMS"); (4) Penguin, LLC; (5) TPG Plastics; and (6) Western Industries.   (*Id.* ¶ 19.)   These blow molders did not provide Ceme-Tube with quality control information, and the only quality control Ceme-Tube used was to inspect the tubes visually, although Ceme-Tube would only use one blow molder at a time.   (*Id.* ¶ 17.)   While Chroma Color also asserts that none of the blow

---

[4] Chroma Color asserts that Bradac's recounting of Swain's representations are hearsay, but as statements of a party opponent's authorized employee, they are not.  Fed. R. Evid. 801(d)(2). Chroma Color also asserts that Bradac somehow lacks personal knowledge to testify about what Swain said and that his statement is a legal conclusion, but Bradac certainly has personal knowledge about what Swain told him, and his statement is not a legal conclusion.  Fed. R. Evid. 602, 704.

molders provided any assurance that they were using the resin specified by Ceme-Tube, Bradac avers that every unit Ceme-Tube sold from August 8, 2013, until December 31, 2020, contained Chroma Color Colorant consistent with that molder's specification sheet.[5] Bradac also avers that Ceme-Tube did not start using a new color supplier in its own manufacture of tubes until spring 2021; and it would normally only do one manufacturing run per year.  (Bradac Decl. (dkt. #165) ¶ 26.)

In particular, Bradac asserts that he switched from Penguin (who had used a non-Chroma Color colorant for an unspecified time) to ACM in March 2013, noting that he specified and later confirmed that ACM used Chroma Color colorant.  (*Id.* ¶ 24.)  Then, in 2015, he switched to BMS and used them until 2018, after which BMS sent Ceme-Tube its leftover Chroma Color colorant for use in Ceme-Tube's in-house manufacturing.  (*Id.* ¶ 25.)

### C.  Price Quotations

Chroma Color sent price quotations following: (1) Ceme-Tube's color match requests; or (2) Ceme-Tube or a blow molder indicating a readiness to order colorant. As a result, although Ceme-Tube's initial purchase orders were dated before Chroma Color sent price quotations, it is undisputed that Ceme-Tube would then regularly place its actual purchase orders *after* receiving price quotations.

---

[5] At his deposition, Bradac acknowledged having received no assurance that the third-party blow molders used Chroma Color colorant beyond the specification sheet provided him at the outset of each relationship.  (Bradac Dep. (dkt. #138-1) 18.)

There appears to be three price quotations in the record for the relevant period.  In July 2013, apparently in response to ACM's price inquiry, Chroma Color sent it a price quotation for "Yellow/UV," and ACM later submitted a purchase order for colorant. (Chroma Color Ex. I (dkt. #138-9); Dkt. #175-1, at 122.)  Ceme-Tube sent Chroma Color a purchase order dated August 6, 2018, with handwriting on the purchase order for "LC45316" under "Description," "1,000" under "Qty," and "9.20" under "Rate."  (Chroma Color Ex. N (dkt. #138-14).)  The purchase order listed no other terms or conditions.  On August 7, Chroma Color then sent Ceme-Tube its price quotation, quoting $9.20 per pound for 1,000 to 1,999 pounds of LC45316 concentrate.  (Chroma Color Ex. J (dkt. #138-10).)  Chroma Color then sent Ceme-Tube an invoice for 1,000 pounds of colorant at $9.17 per pound.  (Chroma Color Ex. P (dkt. #138-16).)  Finally, Ceme-Tube sent a purchase order dated August 29, 2019, to Chroma Color for 500 pounds of LC45316 bright yellow colorant at $9.59 per pound, explaining that it "[w]anted to get a PO in, but need to verify price breakdowns. Waiting on price breakdown from [Murphy]."  (Chroma Color. Ex. O (dkt. #138-15).)  That same day, Murphy sent Bradac a price quotation at $9.59 per pound for 500-999 pounds of LC45316 bright yellow colorant.  (Dkt. #179-13, at 268.)   A few weeks later, Chroma Color sent Ceme-Tube an invoice for 500 pounds of colorant at $9.59 per pound.  (Chroma Color Ex. Q (dkt. #138-17).)

The front of both Chroma Color's 2013 and 2018 quotations read as follows: "This formulation was created upon the best available information from the customer.  This system is expected to provide requested U.V. protection when used at the recommended use rate."  (Chroma Color Ex. J (dkt. #138-10).)  In addition, the bottom of all three

quotations read, "*This quotation is subject to the Sales Terms and Conditions on the reverse side.*" (*Id.* (italics in original).[6]  For his part, Bradac now denies even reading, much less agreeing to, those "boilerplate" sales terms and conditions.  (Bradac Decl. (dkt. #165) ¶ 35.)

On the reverse side, the "Sales Terms and Conditions" read as follows: "Any acceptance of this quotation form is limited to acceptance of the express terms on the face and back hereof.  Any proposal for additional or different terms or any attempt by the buyer to vary to any degree of the terms of this offer in buyer's acceptance is hereby objected to and rejected." (Chroma Color Ex. M (dkt. #138-13).)[7]  The integration clause further explained that: "These Sales Terms and Conditions and any description on the face of the seller's order acknowledgement form constitute a complete and exclusive statement of the terms and conditions of the sale of the goods by the seller to buyer.  There are no other promises, conditions, understandings, representations, or warranties.   This agreement may be modified only in writing signed by the seller."   (Dkt. #138-13, at 1.) The terms and conditions also include an express, one-year limitations period to bring suit and warranty exclusions.  Both provisions are discussed in greater depth below.

---

[6] Ceme-Tube did not dispute this fact in their response to Chroma Color's proposed findings of fact but disputes its binding nature in its summary judgment response brief.  (Dkt. #164, at 8 n.3.) However, all of Chroma Color's price quotations stated they were subject to its Sales Terms and Conditions.  (Chroma Color Ex. I (dkt. #138-9); Chroma Color Ex. J (dkt. #138-10); Dkt. #179-13, at 268.)

[7] There is only one image of the terms and conditions in the record, although neither party asserts that these basic terms and conditions changed materially over the life of the three quotes in issue.

### D. Customer Complaints and Testing

Bradac asserts that he began receiving "significant" complaints about degradation of Ceme-Tube products in March 2020. (Bradac Decl. (dkt. #165) ¶ 36.) At the end of that month, Bradac sent an e-mail to Chroma Color, writing, "I want to talk to you about a Kwik Trip [gas station] in South St Paul that has my tubes. I was in there yesterday, and noticed how faded they were. They are only five years old." (Chroma Color Ex. R (dkt. #138-18) 1.) Bradac asserts that Chroma Color employees then gave him different answers as to how much UV protection was applied. Initially, Murphy told him that he got a "three to five year UV package," but another employee told him that it was a "3 to 5 year UV package *booster*." (Bradac Decl. (dkt. #165) ¶¶ 38-39.) Bradac also talked with Chroma Color's business development specialist Swain in early 2020, who told him "five years [UV protection] was the best they had, and it was going to be good for 8-10 years." (*Id.* ¶ 43.) Swain also reiterated to Bradac that he was "getting the best package Chroma had to offer, and that it should be 10 years; if you didn't get that, something happened somewhere." (*Id.*)

In April, Murphy told Bradac that UV protection was not the problem, and "[i]f the color is actually fading that points to pigments." (*Id.* ¶ 40.) Murphy added, "[t]his yellow has the most light stable pigments available in the market and the UV package is the same as it has always been." (*Id.* ¶ 41.) In May 2020, Chroma Color next sent Bradac a product specification sheet that ostensibly showed Ceme-Tube had only received a one-to-two-year UV protection additive. (*Id.* ¶ 42.) Finally, at an unspecified time, Murphy

8

offered Bradac a "new Max UV formula," which confused him because he believed that Ceme-Tube was already receiving maximum UV protection.  (*Id.* ¶ 44.)

Regardless, shortly after learning of the degradation problem in March or April 2020, Bradac stopped using Chroma Color's additive given the conflicting information that he was receiving from Chroma Color.  (Bradac Dep. (dkt. #138-1) 63; Bradac Decl. (dkt. #190) ¶¶ 26, 45.)  Bradac also retained an engineering firm in September 2021, who informed him on December 10, 2021, that the Chroma Color colorant had "essentially no [UV] protection."  (Dkt. #175-1, at 124.)  Ceme-Tube brought this suit in December 2022.  (Dkt. #1.)

OPINION

Summary judgment is only appropriate if the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  If the moving party meets this burden, then the non-moving party must produce evidence that would permit a jury to reasonably find for it.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The court considers "all of the evidence in the record in the light most favorable to the non-moving party" and "[draws] all reasonable inferences from that evidence in favor of the party opposing summary judgment."  *Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 457 (7th Cir. 2020) (quotation marks omitted).  Chroma Color asserts that it is entitled to summary judgment

because Ceme-Tube's warranty claims are time barred, and its negligence claims are precluded by Wisconsin's economic loss doctrine.[8]

Before turning to the merits of Chroma Color's motion for summary judgment, the court will briefly address the nature of Ceme-Tube's breach of warranty claims.  First, Ceme-Tube asserts that Chroma Color breached its implied warranty of merchantability because the colorant would ordinarily be used outdoors and exposed to sunlight, and the colorant did not contain the required UV protection.  (Sec. Am. Compl. (dkt. #117) ¶¶ 25-28.)  Second, Ceme-Tube claims that Chroma Color breached the implied warranty of fitness for a specific purpose, knowing the colorant would be applied to outdoor products and needed UV protection, but failing to provide sufficient protection.  (*Id.* ¶¶ 29-32.)  Third, and finally, Ceme-Tube claims that Chroma Color breached express warranties as to the "UV qualities and characteristics of the colorant" to induce sale.  (*Id.* ¶¶ 33-38.)[9]

---

[8] Chroma Color also moves for sanctions, complaining that Ceme-Tube and Bradac initially reported not knowing key details about tubes sold, but provided detailed breakdowns, pictures and expert reports shortly before dispositive motions were due.  The court will deny Chroma Color's motion for two reasons.  First, Ceme-Tube provided this information before the discovery cutoff -- June 28, 2024 -- and it does not have any impact on this court's summary judgment decision.  Second, Chroma Color contends that the case must now be relitigated, but as explained in this order, the court is granting Chroma Color's motion for summary judgment, and it has not otherwise identified any *specific* prejudice.  (*See* Chroma Color Br. (dkt. #178) 10 (asserting that it now must subpoena "multiple companies," "may need" to conduct further depositions, and there "may" be additional parties).)  Accordingly, Chroma Color's motion for sanctions is denied.

[9] At summary judgment, Ceme-Tube more specifically asserts that Chroma Color created an express warranty by making "specific, binding warranties regarding the qualities of their product to be provided."  (Ceme-Tube Br. (dkt. #163) 19.)  Although Ceme-Tube does not identify specific statements that amounted to express warranties, the court infers that Ceme-Tube is referring to Swain's representations that (1) it would get Chroma Color's best UV-protection package, and (2) this UV protection would last for ten years.

Wisconsin Statute § 402.313 provides that express warranties are created by "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise." Moreover, an affirmation or promise need only be "a factor in the purchase." *Ewers v. Eisenzopf*, 88 Wis. 2d 482, 488, 276 N.W.2d 802 (1979). While a disputed issue of fact exists as to whether Swain's representations amounted to an express warranty,[10] a reasonable jury viewing the evidence in a light most favorable to Ceme-Tube could conclude that Swain's representation factored into its purchase decision. Accordingly, Chroma Color's motion for summary judgment turns on whether Ceme-Tube's warranty claims are barred by the one-year limitation period contained in the terms and conditions of sale.

## I.  Terms and Conditions

As an initial matter, the court must determine whether those terms and conditions govern the parties' relationship. Most fundamentally, under Wisconsin law, an offer is a communication by a party of what it will give or do in return for some act by another. *In re Lube's Estate*, 225 Wis. 365, 368, 274 N.W. 276 (Wis. 1937). Moreover, the offer must look to the future and "be so definite in its terms, or require such definite terms in the acceptance, that the promises and performances to be rendered by each party are

---

[10] In particular, Ceme-Tube points to *no* evidence that Swain's alleged representations, made five years before any direct sales, were a factor in its decision to purchase Chroma Color colorant, and Ceme-Tube disputes representing anything more than that its product would be resistant to the inevitable effects of UV exposure over time.

reasonably certain." *Farnsworth, McKoane & Co. v. North Shore Sav. & Loan Ass'n*, 504 F. Supp. 673, 676 (E.D. Wis. 1981) (quotation marks omitted).

Chroma Color argues that its separate price quotations were offers containing the relevant terms for both direct and third-party sales. Whether a quotation is an offer is a question of fact that requires discerning the parties intent. *All. Laundry Sys. LLC v. Stroh Die Casting Co.*, 2008 WI App 180, ¶ 33, 315 Wis. 2d 143, 763 N.W.2d 167; *Nickel v. Theresa Farmers Coop. Ass'n*, 247 Wis. 412, 415-16, 20 N.W.2d 117 (1945). "Courts often consider a quotation a preliminary step in negotiations because it does not have the level of detail and completeness of a typical offer." *All. Laundry Sys. LLC*, 2008 WI App 180, ¶ 33. Details relevant to whether a quote is an offer include "(1) a description of the goods to be sold, (2) the quantity and price of each item and related terms of the bargain, (3) the extent of prior inquiry, and (4) the number of persons to whom the price is quoted." *Id.*

Beginning with direct sales to Ceme-Tube, Chroma Color's price quotations were highly detailed. First, the quotations listed a specific formula of bright yellow concentrate to be sold. Second, they listed the price per pound of colorant at various quantities. Third, Chroma Color apparently sent the quotations after Ceme-Tube inquired about colorant price. Fourth, the quotations listed the applicable terms and conditions as to acceptance, warranties, samples, claims, force majeure, confidential information, credit, price, risk of loss, and delivery. (Ex. M (dkt. #138-13).) Equally as important under Wisconsin law, Ceme-Tube *accepted* those offers by then submitting purchase orders with no additional terms or conditions or disavowal of the terms and conditions offered by Chroma Color. *See Stoughton Trailers, LLC v. ArcelorMittal Dofasco, Inc.*, No. 07-CV-374-BBC, 2008 WL

12

4722398, at *5 (W.D. Wis. Apr. 8, 2008) ("[d]efendant's order acknowledgments in response to plaintiff's purchase orders operated as a timely acceptance")  Finally, neither party disputes that there was consideration when the parties exchanged money for colorant.

For its part, Ceme-Tube argues instead that the terms and conditions of the contract were really set forth in earlier, oral negotiations between Bradac, Swain and Murphy, asserting generally that the terms of those negotiations "explicitly contradict" the terms on Chroma Color's quotations, although not specifically identifying the conflicting terms except as to conflicting understandings as to warranties for UV protection.  (Ceme-Tube Br. (dkt. #163) 7.)   Moreover, taking the evidence in the light most favorable to Ceme-Tube as the non-moving party, Swain told Bradac that Ceme-Tube would get the best UV-protection in 2008, then in 2013, that he was getting the "best Cadillac package," including ten years of degradation protection and slow degradation thereafter.  However, under the circumstances in 2008, apparently some five years before Ceme-Tube's first purchase, neither of Swain's statements were sufficiently detailed to constitute a binding offer and acceptance, much less consideration, especially when Ceme-Tube had provided *no* details about those negotiations beyond the discussion of the UV protection Chroma Color's product would afford.  Even in 2013, Ceme-Tube provided *no* evidence that Bradac, Swain and Murphy ever discussed, much less settled on, other essential terms of a binding contract, including price per pound of colorant, how many pounds of colorant would be ordered or provided, or any of the other basic terms of purchase.  *See Goebel v. Nat'l Exchangors, Inc.*, 88 Wis. 2d 596, 615-16, 277 N.W.2d 755 (1979) (agreement fatally vague

13

when it failed to include number of apartments to be built). Since summary judgment is the "put up or shut up time in litigation," Ceme-Tube has simply provided insufficient detail to allow a reasonable jury to conclude that Swain's representations were offers, nor that a binding oral contract was formed between it and Chroma Color out of those discussions. *Brown v. CACH, LLC*, 94 F.4th 665, 667 (7th Cir. 2024).

The one arguable exception to these findings concerns a possible amendment to the terms and conditions adopted by the parties following their original exchange of forms in July 2013, since Bradac claims Swain affirmed express warranties for the "Cadillac package" and ten years of freedom from UV degradation. However, there are at least two, additional problems with this narrowed claim. First, the Terms and Conditions include a fully integrated provision, disavowing any other warranties than those set forth in writing, as well as *any* amendment not in writing. Wis. Stat. § 402.202 ("Terms . . . set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented: By evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement."); *Kuehn v. Safeco Ins. Co. of Am.*, 140 Wis. 2d 620, 624-25, 412 N.W.2d 126 (Ct. App. 1987) (trial court properly considered parol evidence in determining missing term in a *partially* integrated contract, explaining, "it is proper to consider parol evidence which establishes the full agreement as long as the parol evidence does not conflict with the part that has been integrated in writing"). Second, as discussed below, even if an oral amendment were

14

recognized in a fully integrated contract under Wisconsin law, it would not change the one-year limitation period for Ceme-Tube to bring a claim for breach of that warranty, as discussed in detail below.

Similarly, even assuming sufficient privity for Ceme-Tube to assert claims standing in the shoes of its third-party molders, their purchases would at most be bound by the same terms and conditions of Chroma Color's contracts with the blow molders.[11]  *Cf. Jones v. Poole*, 217 Wis. 2d 116, 121, 579 N.W.2d 739 (Ct. App. 1998) ("When a right has been created by a contract, the third party claiming the benefit of the contract takes the right subject to all the terms and conditions of the contract creating the right.").  While only one of Chroma Color's price quotations to a third-party blow molder is in the record, that quotation was similarly detailed to those quotations sent to Ceme-Tube, prominently stating that it was subject to identical "Sales Terms and Conditions" on the back, and was automatically sent whenever blow molders indicated a readiness to order its colorant.  (Ex. I (dkt. #138-9).)

## II.    Time Bar

Since the binding terms and conditions of both direct and third-party sales state that "[a]ny cause of action arising from this agreement, or breach of it, must be commenced

---

[11] Chroma Color fairly argues that Ceme-Tube was not in sufficient privity to assert claims as a third-party beneficiary of Chroma Color's contracts with its blow molders.  (Ceme-Tube Br. (dkt. #163) 9.)  *See St. Paul Mercury Ins. Co. v. The Viking Corp.*, 539 F.3d 623, 626 (7th Cir. 2008) ("Wisconsin law requires privity of contract between the parties before liability can be founded on breach of express or implied warranty.")  Regardless, the court need not decide whether there was privity because Ceme-Tube would still be bound by the identical terms and conditions offered by Chroma Color in its price quotations to those molders.

within one year after the cause of action occurs," those claims are time-barred.  (Chroma Color Ex. M (dkt. #138-13).)  To begin, Ceme-Tube asserts that its warranty claims do not "aris[e] from" the price quotation terms and conditions.  Even ignoring that those terms and conditions purport to disclaim any express or implied warranties, a breach of warranty claim requires a contractual relationship under Wisconsin law, so the court concludes that any arguable warranty claims arise out of the relevant contract – here, the price quotation terms and conditions as expressly accepted without qualifications by both Ceme-Tube and all third-party molders.  *See* Wis JI-Civ 3200 ("A claim for breach of warranty ordinarily depends upon a contractual relationship between the parties."); Wis JI-Civ 3201 ("A warranty that the goods (product) shall be merchantable is implied in a contract for their sale"); *St. Paul Mercury Ins. Co.*, 539 F.3d at 626 (privity of contract required between the parties before liability can be founded on warranty claims).

Typically, a breach of contract action must be commenced within six years after the cause of action has accrued.  Wis. Stat. § 402.725.  However, Wisconsin law allows merchants to contract for a shorter limitation period than statutorily provided.  *Id.*  A warranty action generally accrues when the breach occurs, typically at the time of delivery of the goods.  *Selzer v. Brunsell Bros.*, 2002 WI App 232, ¶ 16, 257 Wis. 2d 809, 652 N.W.2d 806.  However, if the warranty "extends to future performance of the goods and discovery of the breach must await the time of such performance," the cause of action accrues when "the breach is or should have been discovered."  Wis. Stat. § 402.725.  Even so, this "future performance" exception does not apply to implied warranty claims, as "implied warranties cannot, by their very nature, explicitly extend to future performance,"

16

and the statute of limitations will always start to run from the time the goods were tendered. *Selzer*, 2002 WI App 232, ¶ 24.

### A. Implied Warranties

Accordingly, for Ceme-Tube's implied warranty claims based on direct sales, that one-year limitation period began running sometime in 2019, when Ceme-Tube presumably took delivery of its last order of Chroma Color colorant (it had certainly taken delivery by early 2020 when it stopped using Chroma Color colorant), so the limitation period expired sometime in 2020, about two years before Ceme-Tube filed suit in 2022. As explained above, its third-party sales are also subject to the same terms and conditions as its direct sales, and thus, those claims are likewise time barred.[12]

Even if the terms and conditions did not apply to implied warranty claims arising out of sales to third-party blow molders, those claims would still be barred by the six-year statutory limitations period, since a molder last ordered colorant in March 2015 and Ceme-Tube did not file suit until December 2022. (Bradac Decl. (dkt. #165) ¶ 25.) In particular, blow molders would have taken delivery of the colorant shortly thereafter, or at the very least, sometime before December 2016, so Ceme-Tube's implied warranty claims for sales to third-party blow molders are also barred by the six-year limitations period.

Alternatively, the terms and conditions disclaimed any implied warranties of merchantability or fitness for purpose by warranting only that its products would "conform to the manufacturing specifications as applicable to such products established or accepted

---

[12] Ceme-Tube used third-party blow molder TPG for a limited production run in 2020 (Bradac Decl. (dkt. #165) ¶ 8), but any claims based on colorant sales to TPG would also be time barred.

by seller," expressly excluding all warranties "WHETHER EXPRESSED OR IMPLIED BY OPERATION OF LAW OR OTHERWISE, INCLUDING BUT NOT LIMITED TO ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR PURPOSE." (Ex. M (dkt. #138-13).)  Wisconsin Statute § 402.316(2) provides that "to exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous."  Similarly, "to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous."  *Id.*  "Conspicuous" means a term that is "written, displayed, or presented that a reasonable person against which it is to operate ought to have noticed it."  Wis. Stat. § 401.201(f).  Among other things, a term is "conspicuous" when it is "in the body of a record . . . in larger type than the surrounding text."  *Id.* § 401.201(f)2.

Here, although the warranty exclusion was on the back of the price quotations, the front of the quotations read in italics that, "*[t]his quotation is subject to the Sales Terms and Conditions on the reverse side*."  (Ex. J (dkt. #138-10).)  On the reverse side, the type was smaller, but certainly readable, with normal margins.  Plus, the warranty *exclusion* was in a section titled "Warranty and Warranty Disclaimer" and written in all caps, satisfying the requirement of conspicuousness.  (Chroma Color Ex. M (dkt. #138-13)); *Artisan* & *Truckers Cas. Co. v. PACCAR Inc.*, No. 23-CV-219, 2024 WL 551860, at *8 (E.D. Wis. Feb. 12, 2024) (explaining that font and margin size are relevant to whether a term is conspicuous). Further, the warranty exclusion specifically mentioned "merchantability," so the conspicuous language in the written terms and conditions was sufficient to protect Ceme-Tube from surprise and successfully disclaimed any implied warranties.  Comment 1 to

Uniform Commercial Code, § 2-316 (purpose of corresponding section of the UCC is "to protect a buyer from unexpected and unbargained language of disclaimer by permitting the exclusion of implied warranties only by conspicuous language").

### B. Express Warranty

Even applying the "future performance" exception to Ceme-Tube's express warranty claims, those claims would also still be time barred because Bradac discovered the breach in early 2020 but failed to file suit until December 2022. Indeed, Bradac acknowledged fielding complaints about Ceme-Tube products prematurely degrading as early as March 2020, and he informed Chroma Color's Murphy in April 2020 that five-year-old tubes at a Kwik Trip were faded. Around that same time, Ceme-Tube also stopped using Chroma Color product altogether out of concerns that its tubes' color was fading too rapidly.

In fairness to Ceme-Tube and Bradac, the court accepts, as it must for purposes of summary judgment, that Chroma Color's employees gave Bradac the runaround about the length of UV protection Ceme-Tube had gotten, telling him at various points that Ceme-Tube had received one to two years' UV protection, a "three to five year UV package," a "3 to 5 year UV package *booster*," and "five years [UV protection] was the best they had, and it was going to be good for 8-10." Another Chroma Color representative also told Bradac that the problem was really with the pigments, not the UV protection.

However, even if the employees' representations were inconsistent, each generally indicated that Ceme-Tube had received less than the ten-years of UV protection Bradac now claims had been expressly warranted *and* the product was showing signs of UV degradation well before then. Further, the employees' representations suggested that

Chroma Color's product was the problem, which distinguishes this case from *Haley v. Kolbe & Kolbe Millwork Co.*, No. 14-CV-99-BBC, 2015 WL 3774496 (W.D. Wis. June 16, 2015), where the court concluded that plaintiffs could not have discovered that their windows were defective until years later because defendant initially blamed leaking on things *other than* the windows. *Id.* *9-10.  To be sure, one Chroma Color employee blamed pigments, and not the UV protectant, but even that explanation still pointed to Chroma Color's product as the source of the problem in direct contradiction to Bradac's claim of top of the line UV protection for up to 10 years.

Thus, no reasonable jury could conclude that Ceme-Tube had not discovered that it had received a lesser UV package by May 2020 then now claimed, since by that time: (1) Bradac had observed a five-year-old, degraded tube; (2) Chroma Color's employees had allegedly represented that Ceme-Tube had not gotten the promised ten-year formula; and (3) Bradac had stopped using Chroma Color's colorant based on those same concerns. Further, even if Bradac had not discovered the problem by May 2020, he should have discovered it well before an engineering firm told him there was no UV protection in December 2021, because the evidence shows that he did not even *contact* an engineering firm until September 2021, more than a year after he learned of the degradation problems. (Dkt. #175-1, at 124.)

III.   **Wisconsin's Economic Loss Doctrine**

Finally, under the economic loss doctrine, the purchaser of a product is barred from using tort law to recover from the manufacturer any purely economic injuries (such as a loss of the product's value) arising from that product's failure to work as expected.  *See*

*Linden v. Cascade Stone Co.*, 283 Wis.2d 606, 613 699 N.W.2d 189 (2005); *Wausau Tile, Inc. v. Cnty. Concrete Corp.*, 226 Wis.2d 235, 245-46, 593 N.W.2d 445 (1999).   In this case, Ceme-Tube does not dispute that its claimed loss due to Chroma Color's alleged negligence was solely economic, but rather asserts that the "other property" exception to Wisconsin's Economic Loss Doctrine still permits recovery because the tubes and the concrete bases were not an integrated system.

Certainly, the economic loss doctrine does not preclude actions in tort for "damage to property other than the product itself," *Wausau Tile*, 226 Wis.2d at 247, "[b]ut there's a catch: If the defective product is a component of a larger, integrated system, damage by that component to the other elements of the system, or to the system as a whole, is likewise considered damage to the defective component itself, and so does not qualify as damage to other property." *Haley v. Kolbe & Kolbe Millwork Co.*, 866 F.3d 824, 828 (7th Cir. 2017) (quotation marks omitted).  The integrated system test looks "to see whether the allegedly defective product is an [integral] component in a larger system." *State Farm Fire & Cas. Co. v. Hague Quality Water, Int'l*, 2013 WI App 10, ¶ 8, 345 Wis. 2d 741, 826 N.W.2d 412.  "If a product has no function apart from its value as part of a larger system, the larger system and its component parts are not other property." *Id.* (quotation marks omitted).

On this record, there is no reasonable dispute that Ceme-Tube's tubes were part of an integrated system, and Chroma Color's colorants were part of tubes for that system. (Ceme-Tube Br. (dkt. #163) 29 n.12.)  In particular, despite Ceme-Tube arguing that the tubes and underlying concrete bollards and pole bases were not part of an integrated system, the court is satisfied that no reasonable jury could find the bollards and pole bases

and the tubes did not form an integrated system. Bollards are used to protect things and people from collisions with cars (Second Am. Compl. (dkt. #117) ¶ 9), and the tubes were bright yellow to prevent drivers from accidentally striking the bollards. Bradac also explained that the tubes came with a cap that prevented water or "other contaminants" from getting between the tube and cement, damaging the cement (presumably helping prolong the bollard's structural integrity and ability to stop a car). (Bradac Dep. (dkt. #138-1) 36.) Finally, the light pole base covers appear to have a similar purpose -- preventing the base from being accidentally struck by a vehicle and degrading.

Accordingly, the closeness of the relationship between the tubes and the concrete structures distinguishes this case from *State Farm Fire & Cas. Co.*, where the Wisconsin Court of Appeals found no integral relationship between a water softener and damaged drywall, flooring and woodwork. *State Farm Fire & Cas. Co.*, 2013 WI App 10, ¶ 9. Rather, as the concrete structures and HDPE tubes formed one structure, this case is like those where Wisconsin courts found components of buildings to be part of an integrated system. *E.g.*, *Bay Breeze Condo. Ass'n, Inc. v. Norco Windows, Inc.*, 2002 WI App 205, ¶ 27, 257 Wis. 2d 511, 651 N.W.2d 738 (leaking windows did not damage other property because windows and walls are part of an integrated system ); *Kmart Corp. v. Herzog Roofing, Inc.*, 2018 WI App 71, ¶¶ 14-16, 384 Wis. 2d 632, 922 N.W.2d 311 (damage to the building itself from faulty roof was not damage to "other property," but damage to store inventory was not part of an integrated system). Similarly, the tubes have no independent value aside from covering bollards and light poles which supports the conclusion that the bollards, bases and tubes were parts of an integrated system. *See Linden*, 2005 WI 113,

¶ 28 (integrated systems exception applied when stucco and roof shingling had no independent value or use apart from their function as components of a house). Accordingly, Chroma Color is entitled to summary judgment on all claims asserted against it by Ceme-Tube in this lawsuit.

ORDER

IT IS ORDERED that:

1) Chroma Color's motion for summary judgment (dkt. #132) is GRANTED.

2) Chroma Color's motion for sanctions (dkt. #178) is DENIED.

3) The remaining deadlines in this case are STRUCK, including the trial scheduled to begin on August 12, 2024, and the July 30, 2024, final pretrial conference is CONVERTED to a telephonic status conference to address any remaining issues between the insurance companies and defendant.  Defendant Chroma Color shall initiate that call to the court at 608-264-5087.

Entered this 24th day of July, 2024.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge